Filed 12/15/21  P. v. Maya-Zapata CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JESUS MAYA-ZAPATA,<br><br>        Defendant and Appellant. | A156982<br><br>(Contra Costa County<br>Super. Ct. No. 51715069) |

Appellant Jesus Maya-Zapata was tried before a jury and convicted of 17 sexual offenses arising from his abuse of his stepdaughter over a period of several years that began when she was less than ten years old.  He appeals from a judgment sentencing him to prison for 75 years to life plus 40 years, arguing:  (1) the court should have granted his motion to suppress statements made and evidence seized during his police interrogation; (2) the prosecutor's peremptory challenge of a Latinx woman during voir dire violated *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (3) several of the counts were committed without force, violence, fear or duress, a necessary element of the crimes charged; (4) the court should have instructed on additional lesser included offenses as to some of the counts; (5) the court's

1

instructions lessened the prosecution's burden to prove certain elements of certain crimes; (6) appellant's sentence constitutes cruel and unusual punishment; and (7) the cumulative effect of the trial errors requires reversal. We affirm.

## I. BACKGROUND

Jane Doe was born in 1999 and her parents divorced when she was four. Appellant (who was born in 1981) began living with her mother shortly thereafter. Doe did not like appellant at first, but they gradually became closer and she came to view him as a father figure. Appellant was in charge of discipling Doe when she was younger, which he did by yelling at her or pulling on her ears.

When she was about nine years old, appellant began to touch Doe in a sexual way. She remembered her age because she was still in elementary school and the family lived on Sheryl Drive, and also because the touching coincided with her menstrual period, which she began having when she was nine years old.

Appellant began by touching Doe's legs, thighs, and vagina over her clothes. Doe was afraid but did not tell her mother what was happening because she did not think her mother would believe her. Appellant always told Doe's mother that Doe was a bad person and Doe's mother would react by hitting her or yelling at her. The touching progressed and appellant would grab her hand and put it on his penis. He started putting his fingers inside her vagina.

When Doe was 10 years old, appellant began having sexual intercourse with her once or twice a week. Doe did not tell her mother because she believed she would take appellant's side. The family moved to Linda Street and appellant continued to have sexual intercourse with Doe, using a condom for protection. He initiated the sex by bribing Doe, offering her "money and stuff," and "[i]t was either cooperate or get punished for it." He told Doe he would tell her mother she was talking back and being bad to get her in trouble, and he threated to take away her phone and iPod. When she gave in, appellant would lay her on the bed and remove her clothes.

Doe began giving appellant oral sex about once a week. She did not want to but appellant would offer her things and "it was either that way or no way." The intercourse and oral sex continued, with appellant "bribing" Doe by giving her money or letting her go out with her friends or convincing her mother to let her go out with her friends.

The family moved to a house on Frances Road, and appellant began having anal sex with Doe once or twice a month. It was very painful for Doe and she bled from it; appellant told her he would use more lubrication.

The sexual contact continued, as did appellant's efforts to persuade Doe to participate by taking away her phone and by threatening to tell Doe's mother she was acting badly. Appellant would offer her money in exchange for sexual acts, with the amount offered dependent on the act, and she came to see that behavior as "normal." Doe remembered an incident in which

appellant caught her texting a boy and pulled her ears, similar to how he had done when she was a young child.

Appellant stopped touching Doe when she was 16 or 17. Her grandmother had come to live with the family, and because Doe felt her grandmother supported her, she started to refuse appellant's demands for sex. On one occasion appellant texted Doe and offered her $100 for sex, and she refused and threatened to call the police. Appellant told her she was missing out.

Doe had a boyfriend whom appellant did not like, and in the summer of 2016 (when Doe was 17), she told him what appellant had done to her. Doe's boyfriend gave her the courage to speak out and she told her grandmother, who told her mother. Doe ran away to live with her boyfriend's family and then went to the police.

Doe first met with a deputy sheriff in a Walgreen's parking lot accompanied by her mother because she did not want to meet appellant at the residence. She told the deputy that appellant had begun molesting her when she was nine years old and that they began having sexual intercourse when she was 10 years old. The deputy passed the information to a detective in the special victims' unit, who interviewed her regarding the molestations. Doe told the detective that appellant had started having intercourse with her when she was 10, and oral and anal sex when she was 11. The detective arranged for Doe to participate in a recorded pretext call, which was played for the jury.

In the call, Doe told appellant she was confused about her feelings. Appellant told her "You like for me to do it to you,

4

actually." Appellant offered to help Doe with money and when Doe asked him if he would want sex, responded "Well, yes, I would indeed like it. Of course, if—like we say, I beg for it." He also told her that if they started having contact again they wouldn't have to have anal sex, but later in the call told her "that's also part of a couple" when she stated that she would not want to have sex that way. Appellant acknowledged having offered and given Doe money for sex and explained that he did it because he liked her. He estimated they had been having sex since she was 12 or 13 years old. He stated that Doe had wanted sex, and denied that she had been only 10 years old when they started. When Doe mentioned that she had been "little," appellant told her, "No, not little, well, you were the one who wanted it."

Doe identified a photograph of appellant's penis that had been taken from appellant's phone.

Appellant was charged with sexual intercourse with a child 10 years of age or younger (Pen Code,[1] § 288.7, subd. (a); count 1); oral copulation or sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b); count 2); lewd act on a child under 14 (§ 288, subd. (a); count 3); sodomy of a child under 14 with a ten-year age difference (§ 286, subd. (c)(1); count 4); aggravated sexual assault (rape) on a child under 14 with a ten-year age

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

5

difference[2] (§ 269, subd. (a)(1)/269, subd. (a)(2) and (a)(6)); counts 5 and 6); two counts of aggravated sexual assault (sodomy) on a child under 14 (§ 269, subd. (a)(3)/261, subds. (a)(2) and (a)(6); counts 7 and 8); aggravated sexual assault (oral copulation) on a child under 14 (§§ 269, subd (a)(4)/former 288a,[3] subds. (c)(2), (c)(3) and (d); count 9); four counts of forcible lewd acts on a child (§ 288, subd. (b), counts 10 through 13); forcible oral copulation of a minor 14 years of age or older (§ 288a, subd. (c)(2)(C); count 14); sodomy of a person under 16 years of age (§ 286, subd. (b)(2)); count 15); and two counts of lewd act on a minor with a ten-year age difference (§ 288, subd. (c)(1); counts 16 and 17). He was convicted of all counts following a jury trial.

## II. DISCUSSION

### A. *Motion to Suppress*

Appellant argues he was prejudiced because the court should have granted his in limine motion seeking to suppress certain evidence on the grounds that it was obtained without a valid waiver of the right to counsel, in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We reject the claim.

---

[2] Section 269 was amended in 2006 to reduce the 10-year age difference required for a violation of the statute to seven years. (Stats. 2006, ch. 337, § 6; Initiative Measure (Prop. 83), § 5.) Appellant was more than 10 years older than Doe so the amendment is immaterial for our purposes.

[3] Renumbered as § 287 effective January 1, 2019. (Stats. 2018, ch. 423 (SB 1494).)

1. Procedural Background.

Appellant was interrogated by two sheriff's detectives after the pretext call. He was advised of his *Miranda* rights, including the right to speak to an attorney during questioning, and he indicated that he understood these rights.

The lead interrogating detective then asked appellant some general questions and stated: "Okay. I'm going to be . . . honest with you, okay? I'm going to be honest and I'm going to tell you why we're here, but I want you to. . . look me in the face, please. I also want you to be very honest with us. We're going to ask you some things but I would like you to be honest; okay? We could have—" Defendant interjected, "Didn't you say you were going to bring a lawyer or something?" The detective replied, "No, it's just going to be us right now; okay? There are two sides to everything. . . ." Appellant proceeded to make incriminating statements to the detectives and wrote a letter of apology to Doe at their behest. He also gave the detectives permission to search his cell phone, which yielded a picture of his penis and text messages to Doe in which he offered her $100 for sex.

Appellant moved to suppress his incriminating statements as involuntary, arguing that his question "[d]idn't you say you were going to bring a lawyer or something" was an invocation of the right to counsel and the detectives should have immediately ceased their questioning at that point or should have at least clarified what was meant by the statement. He alternatively argued that notwithstanding his earlier indication that he understood each of his *Miranda* rights, his question indicates he

7

had not really understood he had the right to have counsel present during questioning. Appellant also moved to suppress the evidence found on his cell phone during the interrogation as the fruit of the poisonous tree. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 485.)

The court denied the motion. Appellant's statements and the apology letter were never introduced at trial. The prosecution did introduce the text message in which appellant asked Doe for sex in exchange for money and the photograph of appellant's penis (which Doe identified at trial).

Appellant now argues that the court should have suppressed the evidence. He acknowledges that the statements and apology letter were not introduced at trial, but contends he was nonetheless prejudiced because they could have been introduced as impeachment evidence had he testified, and the knowledge of this possibility discouraged him from testifying and explaining the circumstances regarding the charges. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 813 [defendant did not forfeit challenge to voluntariness of statement where he failed to testify and statement was never introduced].) Appellant argues that the photograph of his penis and text messages to Doe were the product of the unlawful interrogation and were prejudicial because they corroborated Doe's testimony.

2. Validity of Initial Waiver of *Miranda* Rights.

Appellant claims his initial waiver of *Miranda* was not knowing and voluntary. We disagree.

8

"*Miranda* makes clear that in order for defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel." (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).) The prosecution has the burden of proving that an accused understood a *Miranda* advisement. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.) A suspect's " 'expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights.' " (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 221.) After a knowing and voluntary waiver, interrogation may proceed " ' "until and unless the suspect clearly requests an attorney." ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 751.)

Although we must independently review the ultimate legal question of whether a statement was obtained in violation of *Miranda*, we accept the trial court's factual findings if they are supported by substantial evidence. (*People v. Scott* (2011) 52 Cal.4th 452, 480.) "[W]hether a particular defendant understood and knowingly waived his rights is essentially a factual question, which we review only for substantial evidence." (*People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1173, fn. 2.)

Here, appellant was advised of his *Miranda* rights, including the right to have an attorney present during questioning, and answered without qualification that he understood his rights. Although appellant did not specifically indicate that he waived his *Miranda* rights, his express and

9

unambiguous acknowledgment that he understood them was sufficient to show a knowing and voluntary waiver. (*Cruz, supra*, 44 Cal.4th at pp. 667–668.) Substantial evidence supports the trial court's determination that appellant initially waived his rights.

### 3. Invocation of Right to Counsel

Appellant alternatively argues that after his initial waiver, he invoked his right to counsel. Again, we disagree.

Upon the assertion of the right to counsel, all questioning must cease until an attorney is present. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485; *People v. Cunningham* (2015) 61 Cal.4th 609, 646 (*Cunningham*).) However, "[f]or a statement to qualify as an invocation of the right to an attorney. . . the defendant 'must unambiguously request counsel.' " (*Cunningham* at p. 646.) If a reasonable police officer would not understand a defendant's statement to be an unambiguous and unequivocal request for counsel, officers have no duty to ask clarifying questions. (*Davis v. United States* (1994) 512 U.S. 452, 461–462 (*Davis*).)

"[A] reviewing court—like the trial court in the first instance—must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying

10

questions of the defendant." (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)

Appellant's question as to whether the detective would be bringing an attorney was not an unambiguous request for counsel. (See *Davis, supra,* 512 U.S. at pp. 459, 462 [" 'Maybe I should talk to a lawyer' " was not an unambiguous or unequivocal request for counsel]; *People v. Molano* (2019) 7 Cal.5th 620, 659 [statement by defendant that he would " 'feel more comfortable' " if he spoke to a public defender first was not a " 'clear assertion' " of the right to counsel]; *Cunningham, supra,* 61 Cal.4th at p. 645 [suspect did not unequivocally request counsel by stating, " 'Should I have somebody here talking for me, is this the way it's supposed to be?"]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 20 [" 'I think I probably should change my mind about the lawyer now. . . I think I need some advice here' " did not show clear intention to invoke right to counsel].) The detectives were not obligated to stop their interrogation and clarify what appellant meant by his question.

4. <u>Effect of Question on Initial Waiver/Harmless Error</u>

Appellant argues that his question about whether the detectives would be bringing an attorney indicates that he did not subjectively understand in the first place the *Miranda* advisement that he was entitled to have an attorney present. He also argues that the lead detective's response to his question about whether they were going to bring a lawyer—"No, it's just going to be us right now"—was misleading in that it suggested appellant did not have a right to have counsel present.

11

Even if we construed appellant's statement in this way and assume a *Miranda* violation, reversal is not required.  We review a *Miranda* violation under the harmless-beyond-a-reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.)  The People must show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict.  (*Ibid*.)

As noted, the incriminating statements to the detectives and the apology letter to Doe that they elicited during the interrogation were not introduced into evidence and could not have directly affected the verdict.  Appellant posits that he was prevented from testifying by the possible use of the statements and letter as impeachment evidence, but that evidence would have been admissible for impeachment purposes even if the detectives had been found to have violated *Miranda*, so we cannot attribute his failure to testify to any assumed *Miranda* violation. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1075–1076 [incriminating statement to police, even if taken in violation of *Miranda*, is admissible as impeachment if defendant elects to testify].)  The other evidence was strong:  in addition to Doe's testimony, appellant acknowledged sexual contact with her during the recorded pretext call, whose admissibility is not challenged, and he further acknowledged that the contact occurred when Doe was 12 or 13 years old.  To the extent he would have denied that Doe was even younger had he testified, he had claimed as much during the pretext call, telling Doe she had not been as young as she remembered.

12

Turning to the photograph of appellant's penis and the text messages to Doe which were found on his phone, those items were physical evidence that appellant seeks to suppress as the fruits of the alleged *Miranda* violation. "The fruit of the poisonous tree doctrine does not apply to physical evidence seized as the result of a noncoercive *Miranda* violation." (*People v. Davis* (2009) 46 Cal.4th 539, 598; *People v. Brewer* (2000) 81 Cal.App.4th 442, 454–455; *People v. Whitfield* (1996) 46 Cal.App.4th 947, 955–957.) Appellant argues that a *Miranda* violation renders an interrogation inherently coercive, but courts have repeatedly held that a violation of the prophylactic rules of *Miranda* does not mean a statement was coerced. (E.g., *Davis* at p. 598; *People v. Bradford* (1997) 14 Cal.4th 1005, 1039–1040.)

Even if we assume the photograph and text message should have been excluded, their admission was patently harmless. The photograph was relevant only because Doe identified it as depicting appellant's penis, but from the other evidence in the case (including the pretext call, in which appellant admitted sexual contact with Doe), it was clear Doe was familiar with that part of appellant's anatomy. The text message to Doe confirmed the sexual nature of her relationship with appellant and his practice of offering her money for sex, but he acknowledged the same thing in the pretext call.

B. Batson/Wheeler *Motion*

Appellant contends the court should have granted his *Batson / Wheeler* motion because the prosecution's reasons for

excusing a Latinx woman were a pretext for ethnic bias.  We disagree.

1.  Background

Prospective Juror Hernandez was a single 23-year-old server with an Associates of Arts degree who had received training as an aviation mechanic.  She indicated on her questionnaire that she had had a positive experience with law enforcement, and she had been "taken in handcuffs for my own protection from abuse."  This abuse was not sexual in nature, and she wrote that neither she nor a close family member had ever been a victim of sexual abuse.  She revealed she had been arrested for assaulting her mother, but that the charges against her were dropped because of the history of child abuse.  She also indicated that she believed sexual abuse was wrong, but would not judge another person without having all the facts.  She had sat on another jury in an eviction case.

When Hernandez was questioned during voir dire, she indicated that despite her positive experiences with law enforcement, she believed she could judge the credibility of a law enforcement witness fairly because "[t]hey're all human.  Everyone makes mistakes."  She explained that she had sat on the jury in a landlord-tenant case about a rent increase where the Section 8 tenant claimed insufficient notification of the increase and the landlord had not kept adequate records.  Hernandez had enjoyed that experience and had learned a lot about tenants' rights.  She stated she did not have an emotional reaction to the charges in this case and would be able to listen to the evidence

14

and the witnesses. She did not have a husband, boyfriend or kids, and tended to stay away from jobs involving kids because she didn't know how to "communicate with them properly." In the event Hernandez saw the evidence differently than the other jurors, she stated she would reexamine the evidence but could vote her conscience.

The prosecutor exercised a peremptory challenge against Hernandez, and defense counsel made a *Batson/Wheeler* motion. An unreported sidebar conference was held. In a reported conference outside the presence of the jury panel, defense counsel put her reasons for the motion on the record, indicating that Hernandez was "Latina" and observing that appellant was "Latino," and while one of the other prospective jurors (who ultimately sat on the jury) might be Latina, nothing Hernandez had said had indicated a bias. The court indicated that it had asked the prosecutor to respond even though it did not appear that the challenge to Hernandez had been racially motivated, and it further stated that the defense had used peremptory challenges against three Latino jurors.

The prosecutor gave three reasons for excusing prospective juror Hernandez: (1) Hernandez had been arrested for assaulting her mother, and even though she had not been charged and believed the police were kind to her, "for me, having a previous arrest is a red flag as a juror;" (2) Hernandez had been on a civil jury and seemed to side with a person who had been on welfare, indicating a tendency to favor the "underdog;" and (3) Hernandez was young and came across as less mature than the other jurors

The court denied the *Batson/Wheeler* motion, observing: "I will say, my observations of her were also that she was very immature. She was giggling. She took up a lot of time with her answers and did seem somewhat enthusiastic and anxious to serve as a juror."

    2. Legal Framework

The state and federal constitutions forbid prosecutors from using peremptory challenges to remove jurors on account of race, ethnicity, gender or membership in a similar cognizable class.[4] (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276–277; *People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).) A defendant who suspects a juror has been challenged for a discriminatory reason must bring a motion under *Batson/Wheeler*, at which point the trial court will analyze the claim using a familiar three-prong test. First, it must determine whether the defendant has made a prima facie showing the prosecutor exercised a peremptory challenge based on race, ethnicity or some other impermissible ground. Second, if the showing is made, the burden then shifts to the prosecutor to

_____

[4] Appellant was tried in 2019. In 2020, the Legislature passed Assembly Bill 3070, which enacts Code of Civil Procedure section 231.7 and codifies the principle that peremptory challenges may not be based on membership in a racial, ethnic or similar group. (Stats. 2020, ch. 318, §§ 1–3.) Among other things, the changes affect the standard of appellate review and make certain reasons for peremptory challenges presumptively invalid. (Code Civ. Proc., § 231.7, subds. (e)–(g), (j).) The changes are effective for criminal trials in which jury selection begins on or after January 1, 2022, and the new law does not apply to appellant's trial. (See Code Civ. Proc., § 231.7, subd. (i).)

demonstrate the challenge was exercised for a neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination by evaluating the proffered reasons and determining whether they are legitimate or pretextual. (*Lenix*, at p. 612; see *People v. Manibusan* (2013) 58 Cal.4th 40, 77.)

In this case, the trial court made no express finding regarding a prima facie case of discrimination, but asked the prosecutor to explain her reasons for excusing Hernandez. We therefore review this as a third-prong case, and review for substantial evidence the trial court's determination that the challenge was not discriminatory. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [whether opponent of a peremptory challenge has proved purposeful discrimination is reviewed for substantial evidence]; *People v. Williams* (2013) 58 Cal.4th 197, 280–281 [when court ruled on ultimate question of intentional discrimination, question of whether defendant established a prima facie case of discrimination is moot].) This standard requires us to give "great deference to the trial court's ability to distinguish bona fide reasons from sham excuses," at least so long as the court made "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

A prosecutor's reason for excusing a juror does not need to be well-founded so long as it is not discriminatory. (*Purkett v. Elem* (1995) 514 U.S. 765, 768.) " '[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies

17

"peculiarly within a trial judge's province." ' " (*People v. Stevens* (2007) 41 Cal.4th 182, 198.) It is presumed an advocate's use of peremptory challenges was constitutional. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1009.) The ultimate issue is "whether it was more likely than not that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170.)

Appellant tries to pick apart the prosecutor's stated reasons for excusing prospective juror Hernandez—her criminal arrest, her apparent sympathy toward the "underdog," and her maturity relative to that of the other jurors—but none of these reasons were " 'implausible or fantastic' " and they were all unrelated to race. (*People v. Huggins* (2006) 38 Cal.4th 175, 227.) We are required to defer to the trial court so long as it undertook a " " " 'sincere and reasoned effort' to evaluate the prosecutor's explanations." ' " (*Ibid.*) It did so.

Appellant's attempt to use comparative juror analysis for the first time on appeal also fails. Appellant focuses on three seated jurors, noting that Juror No. 57 had friends in law enforcement and had positive experiences with law enforcement officers as people; that Juror No. 79 had a former girlfriend who had been raped as a teenager and followed the "MeToo" movement in the news; and that Juror No. 90 had sat on a jury in a manslaughter case that reached a verdict and followed childhood sex cases because he had an 11-year-old daughter. He contrasts these responses with prospective jurors whom the prosecution excused, who had negative feelings about law

18

enforcement or were critical about the prosecution of child sex abuse cases, and argues that Hernandez's responses were closer to those of the seated jurors.

The three seated jurors cited by appellant were mature men with significant educational and life experience, all of whom had children, and they had little in common with Hernandez. Juror 57's positive experiences with law enforcement were based on his friendships with officers whereas Hernandez's arose from their kind treatment of her during an arrest. And while Juror Nos. 79 and 90 can be broadly said to have expressed an interest in or knowledge of childhood sex abuse, Hernandez's abuse as a child was not sexual in nature.

Though comparative juror analysis can be done on appeal even if a comparative review was not conducted below (*Lenix*, *supra*, 44 Cal.4th at p. 622), we agree with appellant's acknowledgement that in this case, there was "very little to compare." Certainly, there is not enough to infer that the only reason for excluding Hernandez was her ethnicity.

C. *Evidence of Duress*

Counts 5 through 14 (two counts of aggravated sexual assault on a child by means of rape, two counts of aggravated sexual assault on a child by means of sodomy, one count of aggravated sexual assault on a child by means of oral copulation, four counts of forcible lewd conduct, and one count of forcible oral copulation) each required proof that the sexual act at issue was accomplished by force, violence, fear or duress. (§§ 269, subd. (a)/261, subds. (a)(2) & (a)(6)/286, subds. (c)(2), (c)(3)/288a, subds.

19

(c)(2), (c)(3), 288, subd. (b)(1).)  Appellant challenges the sufficiency of the evidence to prove this element.  We reject the claim.

We apply the well-established and "highly deferential" substantial evidence standard.  (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.)  "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]"  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

Appellant argues that despite the prosecutor's suggestion that force could be proved because of the size disparity between him and Doe, there was no evidence the acts were committed by force or violence because he did not use more force than was necessary to commit the sexual acts.  It is not necessary to decide this issue, because the prosecutor relied on duress and the evidence was sufficient to support the convictions based on this theory.  (See *People v. Perez* (2005) 35 Cal.4th 1219, 1232–1233 [court must affirm if jury was instructed on factually valid theory supported by the evidence, unless it can be demonstrated jury convicted based on factually invalid ground].)

The jury was instructed that "duress" in the context of sodomy, oral copulation and lewd conduct is "a direct or implied threat of force, violence, danger, hardship, or retribution that

20

causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant." Duress in the context of rape was similarly defined, but, as the jury was properly instructed, it did not include a threat of "hardship." (*People v. Leal* (2004) 33 Cal.4th 999, 1007–1008.)

To determine whether duress was used, the finder of fact should consider "various circumstances, including the relationship between the defendant and the victim, and their relative ages and sizes (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.) " 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*Ibid.*, quoting *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 239; see *People v. Cochran* (2002) 103 Cal.App.4th 8, 13–14 (*Cochran*), disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12;[5] *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) The victim's testimony must be considered in light of her age and her relationship to the defendant. (*Cochran*, *supra*, at pp. 13–14.)

---

[5] In *Soto*, *supra*, 51 Cal.4th at p. 248, footnote 12, the court disapproved language in *Cochran* and other cases suggesting the consent of the victim is a defense to the crime of forcible lewd acts under section 288, subdivision (b)(1).

In this case, the evidence shows that appellant began molesting Doe when she was only nine years old and he was a father figure to her. There was a significant disparity in their age, size and power dynamic. Appellant disciplined Doe by yelling at her and pulling on her ears, and he threatened to tell her mother she was bad and used threats and bribery to get her to comply with his demands for sex. Though the acts underlying the counts in question occurred when Doe was a little older than when the sexual abuse first began (12 to 14 years old instead of 9 to 10 years old), the continuing nature of the sexual contact, fostered by appellant's bribery, threats and manipulation, were sufficient to constitute duress when considering the totality of the circumstances. (*Cochran*, *supra*, 103 Cal.App.4th at p. 13–14.)

Appellant argues that psychological coercion is not enough to establish duress and there must be some kind of direct or implied threat, citing *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*) and *People v. Espinoza* (2002) 95 Cal.App.4th 1287. The reasoning of those cases has been undermined by *Cochran*, *supra*, 103 Cal.App.4th at page 15 (decided by the same court that decided *Hecker*), in which the court found duress where the evidence supported a finding that the victim's compliance in the sexual acts was derived from the "psychological control [her father] exercised over her and was not the result of freely given consent."

Appellant suggests his actions in threatening to take Doe's phone away from her or to not allow her to see her friends was not a threat of hardship, but was simply an exercise of parental

22

authority. Taking a phone from a preteen is an act of parental authority; threatening to do so in order to have sex is not.

C. *Lesser Included Offenses*

The court instructed the jury on lesser included offenses as to several of the counts, most of which contained the element of force and were distinguishable from the charged crimes due to the age element of the offense. Appellant contends the court committed prejudicial error in additionally failing to instruct on sexual intercourse with a minor (§ 261.5), nonforcible sodomy with a minor (§ 286, subds. (b) or (c)) and nonforcible oral copulation with a minor (former § 288a, subds. (b)(1) and (c)(1); see § 287) as lesser included offenses of counts 5, 6, 7, 8 and 9, which alleged aggravated sexual assault on a child under 14 under section 261, subdivision (a)(2) & (6), and count 14, which alleged forcible oral copulation with a minor 14 or older under section 288, subdivision (a). We reject the claim.

"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117–118.) "California decisions have held for decades that even absent a request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." (*Id.* at p. 118.) We review the failure to

23

instruct on a lesser included offense by asking whether it is reasonably probable appellant would have obtained a more favorable outcome had the jury been so instructed. (*People v. Breverman* (1998) 19 Cal.4th 142, 177–178 (*Breverman*).)

We assume for the sake of argument that the nonforcible offenses were lesser included offenses of the charged crimes under either the elements or accusatory pleadings test. But assuming that notwithstanding the lack of a request the court should have instructed on the nonforcible offenses, the failure to do so was not prejudicial because it is not reasonably probable the jury would have reached a result more favorable to appellant if so instructed. (*Breverman*, *supra*, 19 Cal.4th at pp. 177–178.)

The rape underlying counts 5 and 6 was alleged to have been committed between March 31, 2009 and March 30, 2013; the sodomy underlying counts 7 and 8 was alleged to have been committed on March 30, 2011 to March 31, 2013, and from March 31, 2009 to March 31, 2013, respectively; the oral copulation underlying count 9 was alleged to have been committed between March 31, 2009 and March 30, 2013; and the oral copulation underlying count 14 was alleged to have been committed between March 31, 2013 and March 31, 2016. The jury was instructed on nonforcible lewd conduct as a lesser included offense for forcible lewd conduct in counts 10 to 13 (§ 288, subd. (a) and (b)(1)), alleged to have occurred between March 31, 2008, and March 30, 2013, yet it convicted appellant of the greater crime of forcible lewd conduct.

The duress in this case was overarching, born of the parental relationship between appellant and Doe and the history of the sexual abuse. It is inconceivable that a jury which, when faced with the option of nonforcible lewd conduct, nonetheless convicted appellant of forcible lewd conduct, would have concluded that the sexual intercourse, sodomy and oral copulation committed during the same time frame was committed without duress.

We recognize that count 14 was alleged to have occurred later than the forcible lewd conduct in counts 10, 11, 12 and 13 (March 31, 2013 to March 31, 2016 versus March 31, 2008 to March 30, 2013), but given the nature of the duress in this case, which was based primarily on the parental relationship, it is not reasonably probable that a jury would have determined it somehow evaporated during the later years. Remand is not required.

D. *Instructional Error*

Although he did not object in the trial court, appellant argues the trial court's use of pattern legal instructions were legally erroneous in several respects. Assuming the error has not been forfeited, we conclude there was no prejudicial error.

1. Failure to Define "Menace", "Retaliation" or "Retribution"

In CALCRIM Nos. 1000, which defined the elements of forcible rape, "duress" was defined to include a threat of "retribution." In CALCRIM Nos. 1015, 1030 and 1111, which defined the elements of forcible oral copulation, forcible sodomy,

and forcible lewd acts, the court defined "duress" to include a threat of "hardship" or "retribution." Appellant contends these terms had a specific legal meaning and should have been defined. We disagree.

The terms used in the jury instructions were the same as those used in the statutes at issue. "If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in [the] statutory language." (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) Appellant seems to argue that because the statutes defining the crimes allow for a conviction if the crimes were committed by "menace," the instruction should have defined that term as well. But the instructions did not include that term and, as the People note, the prosecution did not argue it as a theory of the case.

2. Specific Intent to Threaten

Appellant next argues that the jury should have been instructed that "duress" requires a specific intent to threaten. The requirement that a sexual offense be committed "by 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury' " does not require a specific intent. (*Senior, supra,* 3 Cal.App.4th at p. 776.) "It describes types of intimidating conduct by the defendant and not any particular state of mind of the defendant." (*Ibid.*) The trial court was not required to instruct on an element that was not required.

3. Parental Prerogatives

Appellant argues that the court should have instructed the jurors that they should consider "the legitimate objectives of

26

parenting" in assessing whether appellant used duress to accomplish his sex crimes. He acknowledges that no case so holds, and we will not be the first court to say that duress is somehow *less* culpable if it is based on the dynamics of a parental relationship.

We agree with appellant that "*all* parenting entails a compulsive environment." When the goals of that "compulsive" environment serve the legitimate objectives of parenting—compelling a child to do her homework or go to bed at a reasonable hour, for example—that is obviously not duress in the criminal sense. When, however, the parental relationship is perverted so that the parent uses the same authority to coerce the child into performing sexual acts with the parent, that is another matter entirely, and the defendant is not entitled to hide behind the veil of "parental prerogatives."

4. Hardship

With the exception of the charges based on rape, the jury was instructed on "hardship" as a basis for duress. This was appropriate. (See *Leal, supra,* 33 Cal.4th at pp. 1004–1010.)

E. *"Hardship" as Component of Duress*

Appellant argues that "hardship," as used to define a basis of duress in the instructions, was unconstitutionally vague. We disagree. (*Leal, supra,* 33 Cal.3d at pp. 1004–1010.)

F. *Cruel and Unusual Punishment*

Appellant argues that his sentence—which is the practical equivalent of life without the possibility of parole—constituted cruel and unusual punishment because it was disproportionate to

the offenses in violation of the United States and California Constitutions. (See U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) We disagree. (*People v. Baker* (2018) 20 Cal.App.5th 711, 719–734 [life sentence for single count under § 288.7 where defendant molested niece was not cruel and unusual punishment]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 [sentence of 135 years to life for offender who molested several children was not disproportionate]; *People v. Alvarado* (2001) 87 Cal.App.4th 178, 199–201 [life sentence for single count of rape during robbery did not violate cruel and unusual punishment clauses]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520 [sentence of 129 years to life not unconstitutional per se when defendant was convicted of 25 sex crimes against single child victim].)

G.  *Cumulative Error*

Appellant argues the cumulative effect of the errors in this case require reversal even if individually they do not. There is essentially nothing to cumulate, and we reject the claim. (*People v. Lewis* (2001) 25 Cal.4th 610, 635.)

## III. DISPOSITION

The judgment is affirmed.

28

_____

                    NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.

*People v. Maya-Zapata/* A156982

29